UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 24-cr-335 (TNM) |
| v. : | |
| : | |
| ROBERT DOWELL, : | |
| : | |
| Defendant : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Robert Dowell has pleaded guilty to two second degree misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count One) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Two). For the reasons set forth herein, the government requests that this Court sentence Dowell to 21 days' imprisonment on Count One, and 36 months' probation on Count Two. The government also requests that this Court impose 60 hours of community service, and consistent with the plea agreement in this case, $500 in restitution.

### I.   Introduction

Defendant Robert Dowell, a 71 year old resident of Florida and former United States Army veteran, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count,

1

threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Dowell was convicted of violations of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count One) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Two). The government's recommendation is supported by the defendant's decisions to: (1) enter the Senate Wing Door despite seeing rioters climbing through broken windows and extensive debris near the entryway resulting from damage to the building; 2) remain inside the Capitol building for approximately 30 minutes and only exit when forced to do so by police officers at the Speaker's Lobby; and 3) immediately attempt to reenter the building through the Rotunda Doors after being forced to leave.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Dowells' crime support a sentence of 21 days' imprisonment, 36 months' probation, and 60 hours of community service.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 1.

*Defendant Dowell's Role in the January 6, 2021 Attack on the Capitol*

In January 2021, Robert Dowell, of Palm Bay, Florida, travelled to Washington, D.C., to protest the results of the 2020 election. On January 6, 2021, Dowell attended a rally at Freedom Plaza before marching to the U.S. Capitol. Dowell approached the Capitol from the west, came up the West Plaza, made his way to the Upper West Terrace, and ultimately approached the Senate Wing Doors.

At approximately 2:13 p.m., the Senate Wing Doors were breached for the first time. Windows on either side of the doors were violently shattered by angry rioters who quickly climbed through the windows into the building. The windows on the Senate Wing Doors themselves were also shattered, and rioters eventually forced open the doors to allow crowds of people who had been waiting on the Upper West Terrace to enter. Shortly thereafter, at approximately 2:25 p.m., the defendant, Dowell, walked through the Senate Wing Doors amongst a crowd of rioters, some of whom were wearing protective gear, waving flags, and yelling.



*Fig. 1 – A still photo from surveillance of Dowell entering through the Senate Wing Doors.*

Videos from this approximate time show that there was debris and shards of glass strewn on the floor. Rioters were pouring in through the broken windows and door, and the building's alarm system was sounding.

Dowell walked with the crowd toward the Crypt, where the size of the group swelled in numbers.



*Fig. 2 – A still photo from surveillance video of Dowell in the Crypt.*

Members of this mob were dressed in tactical gear such as helmets, goggles, and facemasks. Some in the crowd also carried flags/flagpoles, and signs with slogans such as "Save the Republic," and "Stop the Steal" printed on them. As the crowd marched, they chanted multiple things in unison, including "Stop the Steal," "USA" and "Our House." Video shows Dowell joined in, at one point chanting, "Our House" as he walked up the stairs.



*Fig. 3 – A still photo from open source video of Dowell ascending a staircase from the Crypt while chanting "Our House" with the crowd.*

From the staircase, Dowell walked through Statuary Hall toward the House Chamber. In the hallway between Statuary Hall and the House Corridor, a group of U.S. Capitol Police officers were attempting to stop the crowd from proceeding toward the House. Dowell joined the mob of rioters, which eventually pushed past the line of officers and marched toward the House Chamber.

6



*Fig. 4 – A photograph of Dowell walking from Statuary Hall toward the House Chamber shortly before arriving at the Speaker's Lobby.*

At approximately 2:44 p.m., a rioter who was attempting to climb through the window of the barricaded Speaker's Lobby was shot. This caused a large number of law enforcement officers to respond to the area to attempt to control the crowd and to expel rioters. Body worn camera from the responding officers shows that Dowell and the other rioters in the area at this time were ordered to leave the building and directed toward the Upper House Doors. Dowell left through the Upper House Doors, which exit on the east side of the Capitol building, at approximately 2:54 p.m. In total, Dowell remained inside the Capitol for approximately 30 minutes.

After being ordered to leave the building, Dowell next proceeded to the East Central Steps. He stood in a crowd, chatting with other rioters, while he waited to enter the building through the Rotunda Doors. By approximately 3:20 p.m. the large group of rioters assembled outside the

7

Rotunda Doors began to push their way inside – Dowell among them.  However, they were mostly prevented from entering the building due to a coordinated effort by the police to expel the crowds from the Rotunda at the same time.  Dowell made it to the entrance of the Rotunda Doors before he was turned away.



*Fig. 5 – A still photo from surveillance of Dowell attempting to reenter the building through the Rotunda Doors after being expelled from the Speaker's Lobby area.*

FBI agents attempted to speak to Dowell, but he declined to participate in an interview.  At present, the defendant has not provided any expressions of remorse or statements which indicate he understands and regrets the gravity of his actions.

*The Charges and Plea Agreement*

On July 23, 2024, the United States charged Dowell by a two-count Information with violating 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count One) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Two).  On August 26, 2024,

8

pursuant to a plea agreement, Dowell pleaded guilty to both counts of the Information. By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.     Statutory Penalties

Dowell now faces a sentencing for violating 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count One) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Two).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 21 days' imprisonment, 36 months' probation, and 60 hours of community service.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Dowell's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Dowell, the absence of violent or destructive acts is not a mitigating factor. Had Dowell engaged in such conduct, he would have faced additional criminal charges.

9

Dowell approached the Capitol building via the West Front, where he would have encountered a chaotic scene and observed numerous warning signs that clearly indicated he should not be on the Capitol Grounds.  Even assuming Dowell saw nothing concerning as he walked toward the Upper West Terrace, he certainly observed the broken windows and debris scattered on the floor near the Senate Wing Doors.  For example, he would have seen the fact that windows on either side of the door were completely broken out and that large groups of rioters were using the windows to enter and exit the building.  Additionally, Dowell would have heard the sounds of the building's alarms sounding at that time, giving ample warning that neither he, nor anyone else, should be entering those doors.

Despite this, Dowell walked around the Capitol for approximately 30 minutes, eventually making his way to the Speaker's Lobby, where the crowds were heavy and escalating in violence due to the shooting of Ashli Babbitt.  Dowell only left the building because of the coordinated effort of police officers who responded to clear the area in the wake of the shooting.  While Dowell exited the building at the officers' direction, he clearly did not respect the authority of law enforcement, which is evident from the fact that he left the Upper House Doors and proceeded immediately to the East Central Steps where he attempted to re-enter the building through the Rotunda Doors.  He was only prevented from re-entering thanks to the efforts of another group of officers who happened to be securing the Rotunda at the same time.  While Dowell did not commit violence or property damage, his steadfast and persistent efforts to enter and remain within the Capitol certainly contributed to the strength of the group and enabled others to commit much worse offenses. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 21 days' imprisonment and 36 months' probation.

### B. Dowell's History and Characteristics

Based on records obtained during the investigation, it does not appear that Dowell has any criminal history. Records from the United States Army show that Dowell is a military veteran who served in the Army for three years. At the time of his separation from the military, his title was listed as "Chaplain's Assistant/Clergyman."

Open source research conducted on Dowell shows that he plays guitar in a band with his daughter. Additionally, photos from open sources show that prior to January 6, Dowell attended a rally in Washington, D.C. on November 14, 2020, shortly after the election, underscoring his general knowledge of the electoral process.



### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[2] This Court must sentence Dowell based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Dowell has pleaded guilty to Counts One and Two of the Information. These are Class B misdemeanors. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

In considering a sentencing recommendation in this case, the Government closely reviewed similarly situated cases and the recommendations made in those cases. Two such cases that have come before this Court are: (1) *United States v. Jordan Siemers*, 23-cr-20 (TNM), and 2) *United States v. Scott O'Brien*, 24-cr-206 (TNM).

Jordan Siemers was a 25-year-old defendant who pled guilty to two counts of violating 40 U.S.C. § 5104(e)(2)(D) and (G). On January 6, 2021, Siemers travelled with two other people to Washington D.C. to attend the "Stop the Steal" rally, after which she marched with the masses to the United States Capitol. Like Dowell, Siemers approached from the West, coming up the Upper

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

West Terrace where she entered the Senate Wing Doors at approximately 3:08 p.m. As she walked through the building, she encountered a police officer who told her to leave. Siemers left the building through the Senate Wing Doors after being inside for about 9 minutes. At sentencing, the Government requested a 36 months' probation and 60 days' of home detention. The Court imposed 12 months' probation and 60 hours of community service.

On January 5, 2021, Scott O'Brien drove from his home in Texas to Washington D.C. On January 6, he too attended the rally, and marched with the crowd to the Capitol. He approached from the west, and scaled a media tower which had been erected on the West Front in preparation for the inauguration. From this vantage point, he observed rioters fighting with police and the use of flash bangs, pepper spray, and other crowd control tactics. O'Brien continued to advance up the West Front and eventually made it to the Upper West Terrace, where he entered the Upper West Terrace Doors at approximately 2:44 p.m. He proceeded to the Rotunda where he chanted, "Our House" with the crowd and took photos. He left through the Rotunda Doors at approximately 2:51 p.m. At sentencing, the Government requested 14 days' imprisonment and 36 months' probation with 60 hours of community service. The Court imposed 24 months' probation, a fine of $1,000, and 60 hours of community service.

While not a perfect comparison, Dowell's actions certainly contain elements of both Siemers' and O'Brien's offenses. Like Siemers and O'Brien, Dowell approached from the West and came through the Senate Wing Doors. He certainly would have observed a scene similar to the one observed by Siemers and O'Brien – an active riot and multiple warning signs that one should not enter the building. Despite that Dowell entered. Once inside, Dowell was in the building for a considerably longer period of time than either Siemers or O'Brien – and unlike Siemers, Dowell only left upon being forced out by a large police presence at the Speaker's Lobby.

14

...

Additionally, Dowell's attempt to re-enter the building a second time clearly distinguishes him from the other two.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

15

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Dowell must pay $500 in restitution, which reflects in part the role Dowell played in the riot on January 6.[4] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Dowell's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.

## VI.    Fine

The defendant's convictions for violations of 40 U.S.C. § 5104(e)(2)(D) and (e)(2)(G) subject him to a statutory maximum fine of $5,000 per count. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1). The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*,

---

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994). Here, the defendant has not shown an inability to pay, thus the Court should consider the following factors pursuant to the considerations outlined in 18 U.S.C. § 3572(a),

> (1) The defendant's income, earning capacity, and financial resources;
>
> (2) The burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose;
>
> (3) Any pecuniary loss inflicted upon others as a result of the offense;
>
> (4) Whether restitution is ordered or made and the amount of such restitution;
>
> (5) The need to deprive the defendant of illegally obtained gains from the offense;
>
> (6) The expected costs to the government of any imprisonment, supervised release, or probation component of the sentence;
>
> (7) Whether the defendant can pass on to consumers or other persons the expense of the fine.

Because the parties do not anticipate ordering a presentence investigation in this case, the government has little knowledge regarding the defendant's financial situation, but notes that the defendant did not obtain counsel via the CJA panel. The Government defers to the Court regarding the appropriateness of the fine in this matter.

## VII. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant 21 days' imprisonment, 36 months' probation, 60 hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Dowell's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: s/ *Allison K. Ethen*
Assistant United States Attorney
US Attorney's Office, District of Columbia
Capitol Siege Detailee
MN Bar 0395353